FILED

DEC 2 7 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

UNITED STATES <u>ex</u> <u>rel</u>
**SEALED**

§
§
§
§
§
§
§
§
§
§

SA04CA1179 OG

**VS.**

CAUSE NO. SA-04-CA-_____

**SEALED**

**FILED IN CAMERA
AND UNDER SEAL**

## COMPLAINT FOR DAMAGES AND OTHER RELIEF
## UNDER THE FALSE CLAIMS ACT

FILED

Original Complaint
US ex rel Carrington v. AGE Refining, Inc., etal

Page **DEC 2 7 2004**

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

UNITED STATES <u>ex rel</u>      §
JAMES CARRINGTON            §  **SA04CA1179 OG**
                            §
                            §.
VS.                         §      CAUSE NO. SA-04-CA-_____
                            §
AGE REFINING INC,           §      <u>**FILED IN CAMERA**</u>
AGE TRANSPORATION, INC.     §      <u>**AND UNDER SEAL**</u>
ALBERT GONZALEZ             §
                            §

### <u>COMPLAINT FOR DAMAGES AND OTHER RELIEF</u>
### <u>UNDER THE FALSE CLAIMS ACT</u>

### <u>JURISDICTION AND VENUE</u>

1.      This is an action to recover damages and civil penalties on behalf of the

United States of America arising out of false claims presented by Defendants for

reimbursement to the Department of Defense.  This action arises under the provisions of

Title 31 U.S.C. § 3729, <u>et seq</u>. popularly known as the False Claims Act (the "Act") which

provides that the United States District Courts shall have exclusive jurisdiction of actions

brought under that Act.

2.      The False Claims Act ("FCA") provides, in pertinent part, that:

(a)      Any person who…(1) knowingly presents, or causes to be
presented, to an officer or employee of the United States Government…a
false or fraudulent claim for payment or approval; (2) knowingly makes,
uses, or causes to be made or used, a false record or statement to get a
false or fraudulent claim paid or approved by the Government; (3)
conspires to defraud the Government by getting a false or fraudulent
claim allowed or paid…
***

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000 per claim or per violation, plus 3 times the amount of damages which the Government sustains because of the act of that person...

(b)    For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information...(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

3.    On behalf of the United States, the Department of Defense ("DOD") through its agencies and business units regulates payment of federal funds. DOD requires compliance with federal and state law regulating Federal contracts, including statutes and regulations, as a condition of payment by DOD to vendors and contractors.

4.    Section 3732(a) of the Act provides that "any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." The acts complained of herein occurred in San Antonio, Texas within this judicial district, the Western District of Texas.

5.    Under the Act, this complaint is said to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on the Defendants until the Court so orders. The government may elect to intervene and proceed with the action within sixty (60) days after it receives both the complaint and the material evidence and information.

6.    As required under 31 U.S.C. Section 3730 (b)(2) of the Act, Relator shall provide to the Attorney General of the United States and to the United States Attorney for the Western District of Texas, San Antonio Division, shortly after the filing of this complaint, a statement of all material evidence and information related to the complaint. This disclosure statement supports the existence of false and fraudulent claims submitted by the Defendant to the U.S. of America.

7.    This action is brought by Relator on behalf of the United States of America to recover all damages, penalties and other remedies established by and pursuant to 31 U.S.C. § 3729-3733, and Relator James Carrington, individually,  claims entitlement to a portion of any recovery obtained by the United States as a Qui Tam Plaintiff as authorized by 31 U.S.C. § 3730.

## PARTIES TO THE ACTION

8.    Qui Tam Plaintiff, JAMES CARRINGTON ("CARRINGTON" or "Relator") is a citizen and resident of the State of Texas and brings this action on behalf of the United States of America.  At times material to this lawsuit, Relator was employed by Defendant, AGE Refining, Inc. (hereinafter "AGE REFINING"), as the Director of Human Resources and Administration and gained information through his personal knowledge.

9.    AGE Refining, Inc. ("AGE REFINING") is a Texas Corporation located in San Antonio, Texas.  Albert "Al" Gonzalez ("GONZALEZ"), a resident of Dallas, TX, is the President of AGE Refining, Inc., named for Al Gonzales Enterprises, Inc. (AGE), and believed to currently be its sole shareholder.

10.    AGE Transportation, Inc. ("AGE TRANSPORTATION") is a Texas corporation LOCATED IN San Antonio, Texas and represented by its management to be an independent, full-service transportation company providing third party common carrier services to the petroleum industry.

11.    The Department of Defense (DOD) is a department of the United States Government.  DOD administers federal contracts for the benefit of the military through various agencies.

12.    The Defense Logistics Agency (DLA) is a U.S. Department of Defense (DOD) defense agency. The Defense Energy Support Center (DESC) located in Fort Belvoir, Virginia, is the business unit of the DLA that purchases and manages DOD energy products, such as jet fuel.

### HUBZONE PROGRAM

13.    The Historically Underutilized Business Zone (HUBZone) Act of 1997 created the HUBZONE Empowerment Contracting Program to provide Federal contracting assistance for qualified small business concerns located on Indian reservations; in metropolitan area census tracts;  or in non-metropolitan counties where high unemployment rates or low-income levels predominate.  The program's intent is to increase employment opportunities, investment, and economic development  in those areas.  Program qualification is administered by the Small Business Administration (SBA).

14.    These HUBZones are designated based on program criteria.  A current list of all designated HUBZones  is provided on the SBA website.

15.   A small business concern located in a designated HUBZONE is eligible for HUBZone contracting benefits, including sole-source contracts, price evaluation preference (PEP), and set-asides, if the SBA certifies that it meets the following four criteria:

   a. The company must be *"small"* by Small Business Administration (SBA) standards (based on annual sales and/or number of employees as established for each unique industry), AND

   b. The company must be exclusively owned and controlled by <u>US citizen (s)</u>,

      AND

   c. The company's *"principal office"* must be located in a HUBZone; AND,

   d. At least 35% of the company's full-time/full-time equivalent employees must <u>reside</u> in a HUBZone.

16.   The Small Business Administration (SBA), through its HUBZone Office of Empowerment, reviews and approves applications for HUBZONE certification, and also performs reviews and random onsite program exams.  Its resources are limited, and it is well-known to potential contractors and participants that the HUBZone program is vulnerable to contracting fraud sometimes making it possible for ineligible companies to receive HUBZone certification undetected.

17.   In 2003, the Federal Procurement Data System showed that 2,415 government contracts valued at $425 Million were awarded to certified HUBZone companies during a nine month period.

18.   The Price Evaluation Preference (PEP) provides certified HUBZone small

business concerns with a tremendous advantage in a government bid situation, (i.e.

Department of Defense jet fuel contracts).  Full and open competitive contracts can be

awarded with a PEP.  With a PEP, a HUBZONE business can win a contract as the low

bidder when its bid is no more than 10 percent higher than the, otherwise lowest, offer of a

competing non-small business.   In essence, the United States will give preferential

treatment in awarding a contract to a HUBZONE business even though the U.S.  has to

pay up to 10 percent more for the same goods and services.  The United States does this

because it is has a governmental interest in creating employment and generating small

business growth in designated economically depressed geographic zones.

19.    The SBA defines "*reside in a   HUBZone*" to mean, that an individual

employee 1) has lived in a primary residence within a HUBZONE for 180 days, or 2) has

lived in a primary residence within a HUBZone for less than 180 days, but is a currently

registered voter, and has the intent to live there indefinitely.  An employee is permitted to

reside in one designated HUBZONE and work in another designated HUBZONE. This is a

further reflection of the United States interest in providing employment with HUBZONES to

HUBZONE residents without regard to geographic constraints.

20.    A "*principal office*" is that location where the greatest number of employees at

any one location actually perform their work.  This does not apply to companies in the

construction and service industries, which have exemptions based on their frequent need

to assign employees to a client site location to perform their services.   Per HUBZONE

rules, the "*principal office*" does not necessarily have to be the "headquarters" office, and a

company can be a compliant HUBZone concern with other offices in non-HUBZone locations. However, there can be no deviation form the requirement that the "*principal office*" MUST be located within a designated HUBZONE.

## DEPARTMENT OF DEFENSE CONTRACTS

21.    The Defense Logistics Agency (DLA) is DOD's largest combat support agency, providing worldwide logistics support to Military Departments, DOD components, and the Unified Combatant Commands in both peacetime and wartime as well as several civilian agencies, international organizations, foreign countries, and others as authorized.

22.    DLA's origins date back to World War II when America's huge military buildup required the rapid procurement of vast amounts of munitions and supplies. It supplies America's military with almost every consumable item needed to operate, from groceries to jet fuel, and has supported every major war and contingency operation of the past four decades , including Operation Iraqi Freedom.

23.    The DLA is proud to say that "*If America's forces eat it, wear it, maintain equipment with it, or burn it as fuel…DLA probably provides it.*"

24.    The DLA Director reports to the Under Secretary of Defense for Acquisition, Technology and Logistics through the Deputy Under Secretary of Defense (Logistics and Materiel Readiness).

25.    THE DLA relies heavily on independent contractors and outside suppliers. In any given day, it is estimated that DLA awards 8,200 contracts. Its 2004 sales and

services were projected to be in excess of $28 billion dollars.

      26.    The commitment of the United States to attract small business contractor participation is so great that the Office of the Under Secretary of Defense of DoD strives to achieve the five percent goal established by subsection 2323 of title 10, United States Code (U.S.C.) through the use of the price evaluation adjustment prescribed in FAR 19.11 and DFARS 219.11. The DESC provides monthly Roundtable Outreach Counseling Sessions to provide the small business community the opportunity to discuss their capabilities and learn of potential procurement opportunities.

      27.    Small business DOD contracts obtained through fraud, false certifications and false claims by ineligible contractors quash the interest of the United States in supplementing deserving, qualified small businesses, exploit federal funds with no corresponding benefit to the United States, and enrich the rogue contractors.

      28.    The DOD contracts for jet and other fuel that were awarded by DLA to AGE REFINING with a PEP from 1999-2004 form the basis of this lawsuit.

      29.    The oversight and contract management of these contracts is the responsibility of the DESC of the Department of Defense.

## BACKGROUND OF CASE

      30.    From January, 2004 to May, 2004 , CARRINGTON was engaged by AGE REFINING to serve as its Director of Human Resources and Administration. His duties included full responsibility for the leadership of both tactical and strategic HR and

administrative processes and functioned as a business partner in most facets of the refining and transportation divisions.    He was responsible for the development and leadership of peer senior members from both AGE REFINING and AGE TRANSPORTATION. CARRINGTON also served the needs of all employees in both the refining and transportation divisions.  His other responsibilities included, among various duties, providing AGE REFINING and AGE TRANSPORATATION  HR support in personnel matters, compliance with federal and state employment laws, and assisting in maintaining HUBZone status for AGE REFINING, Inc.  CARRINGTON was selected to his position because of his expertise in the area of Human Resources management, his stellar credentials, and his high level of integrity.

31.    AGE REFINING is a small refinery located in San Antonio.  It produces   jet fuel, diesel, solvents, mineral spirits, additives, and heating oil.  Its customers include the federal government (Defense Logistics Agency of the Department of Defense), San Antonio's public transportation system (VIA) and commercial sales clients.

32.    For many years, AGE REFINING has been certified as a "small business" by the U.S. Small Business Administration (SBA) and, in 2000, it was certified as a qualifying entity  under the HUBZone Program.  As a result of the HUBZone certification and the corresponding preferential treatment in government bidding situations, AGE REFINING garnered lucrative federal contracts to provide jet fuel to several Air Force bases in San Antonio and  Del Rio from 1999 to the present.

33.    AGE REFINING maintains an office at 1131 E. Commerce Street which it

purports to be its "*principal office*" where the greatest number of its employees work, as set forth in the HUBZONE law.

34.     AGE REFINING produces jet fuel and other products out of its small refinery located at 7811 S. Presa in San Antonio, TX.  In addition to its management team, AGE REFINING's employees consist of refining staff, laboratory staff and fuel delivery drivers. The delivery trucks are in operation 24 hours a day.

35.     AGE REFINING also maintains a small marketing office at 4455 Alpha Road in Dallas, TX.  GONZALEZ and his wife have lived in their current primary residence in Dallas since 1996.   At all times relevant to this lawsuit, Ruth Ann Ernst , GONZALEZ's personal assistant, and GONZALEZ were the only two employees in the Dallas office.

36.     Prior to 1999, AGE  REFINING had garnered various government contracts for the sale of jet fuel to the various federal governmental agencies.  It transacted these sales under a federal program that afforded small refineries a bidding advantage with respect to contracts with the United States.  The program was curtailed in 1999, but the federal HUBZone Program became a new opportunity for a small refinery, like AGE, to maintain its preferential treatment in vying for lucrative government jet fuel contracts..

37.     In 1999, AGE's jet fuel contract came up for bid, and Gonzalez determined that AGE REFINING would apply for HUBZone status.  Without HUBZone status, AGE would not be able to competitively bid on the fuel contracts it had held for years because the prior federal preferential program had expired.  AGE prepared an application to the SBA in late 1999.

38.     AGE entered into a lease in December, 1999, and opened a new four room office in downtown San Antonio at 1131 E. Commerce #208 ("HUBZone Office"), in a HUBZone, and identified it as the "principal office". AGE indicated in its initial HUBZone application of December 10, 1999, that 7 of its 91 total employees were assigned to work at the HUBZone office.   The application was denied by the SBA for failure to have a qualifying principal office where the "*greatest number of employees at any one location actually perform their work*" and for failure to have at least 35% of its staff as bona fide residents of a HUBZONE as required.

39.     AGE REFINING , under the direction of GONZALEZ and the management team, proceeded to rent several apartments in the HUBZONE and recruited employees within its existing workforce, who were willing to move and "reside" in the HUBZONE for a stipend of $200 a month.   For those new "residents", GONZALEZ mandated that they register to vote so as to qualify under the HUBZone regulations.

40.     GONZALEZ protested the denial of the application by the SBA on or about December 13, 1999, and immediately advised the SBA on or about December 15, 1999, that AGE REFINING would be reassigning its truck drivers from its refinery at 7811 S. Presa to the HUBZone principal office on E. Commerce Street , together with other top management employees.   The Dispatcher and 17 truck drivers, all of them individuals residing in a HUBZONE, were reassigned to the HUBZONE office.   AGE REFINING certified that the number of AGE REFINING employees at its HUBZone office had changed to 54 from the 7 of the prior week.

41.    The SBA again denied the application citing inability to corroborate the location of several of the HUBZONE home addresses provided for various employees listed.   Additionally, the SBA cited AGE REFINING's failure to show that the greatest number of employees performed their work at the HUBZone location on Commerce Street. This denial was the result of a surprise onsite visit to the HUBZONE location on or about December 15, 1999, where the investigators found less than seven employees working there.   The SBA team then immediately drove to the South Presa location where they found the vast majority of employees working.   GONZALEZ and AGE REFINING disputed this finding, citing that the Presa St. plant was undergoing a once-a-year "turn around" cleaning requiring the presence of all its employees.

42.    Included in a list of HUBZone residents and AGE employees presented on the HUBZONE application to the United States dated on or about December 15, 1999, were GONZALEZ and his wife, Sharron Gonzalez, who had been newly hired by AGE. Many of the new HUBZone "residents" were top management, and the addresses listed for their homesteads are those of the HUBZONE apartments rented by AGE REFINING. Relator has it on belief and information, that, in some cases, the legitimate address of a legitimate employee was given as the home address of other employees so as to qualify them as bona-fide HUBZone "residents".

43.    In late 1999 and early 2000, AGE REFINING developed a list titled "*Locations of Address in HUBZones that can be used by AGE*" which included four and more "safe addresses" belonging to friendly family members and friends of AGE

REFINING employees.  These addresses were made available for use by AGE REFINING

so that it could represent to the SBA on its HUBZONE application that certain of its

employees lived in the HUBZONE.  Relator has it on belief and information that,  many of

these employees showed addresses that were not theirs, or they  "subleased" their

"homes" from AGE REFINING, or worked in San Antonio during the week and went home,

outside the HUBZONE, on weekends.

44.    GONZALEZ, as his correspondence during the December, 1999 to April,

2000 timeframe will show , became frantic at the thought of losing the lucrative jet fuel

contracts AGE REFINING had historically been awarded.  These contracts had, in the

past, represented 50%+ of AGE REFINING's gross sales.  These contracts were valued at

tens of millions of dollars for AGE REFINING, and GONZALEZ came to realize that AGE

REFINING could only compete in the bidding with a Price Evaluation Preference (PEP),

which could only be obtained through HUBZONE certification.  GONZALEZ aggressively

pursued HUBZone certification.

45.    On or about December 6, 1999, the SBA made a field visit to the HUBZone

office of AGE REFINING and again found  that it did not meet the HUBZONE criteria, this

time on the basis of no "principal office" at Commerce Street location.  The SBA informed

GONZALEZ that " *Our report reveals that the greatest number of your support and

administrative staff perform their work at S. Presa and the trucks (which are used by the

majority of your employees to perform their work) remain parked and maintained at the S.

Presa"* location.

Original Complaint                                                                    Page 14
US ex rel Carrington v. AGE Refining, Inc., etal

46.    GONZALEZ was running against the clock in late December, 1999. In order

to bid on jet fuel contracts let in 1999, he needed to have his HUBZONE certification

retroactively effective in mid-October, 1999. GONZALEZ worked to have AGE REFINING

appear as being compliant with the HUBZONE requirements. Ultimately, AGE REFINING

was certified as a HUBZONE business on February 3, 2000, but was unable to bid on

contracts for 1999.

47.    In 2000, AGE REFINING had an employee base of 92 employees which

included administrative personnel, lab workers, refinery workers and delivery truck drivers.

There were over 50 drivers and, of those, approximately 17 drivers resided in a

HUBZONE.

48.    In an effort to avoid the HUBZONE certification problems of 1999,

GONZALEZ devised a plan to move a number of AGE REFINING's employees to a new

entity, so as to attain the proper ratios of HUBZONE residents and a 35% employee

assignment to AGE REFINING's "*principal office*".

49.    GONZALEZ directed  several senior (female) officers of AGE REFINING to

form  a new "independent" company called AGE Transportation, Inc. in 2001. Relator has

it on information and belief that  AGE REFINING is a captive client of AGE Transportation,

which provides 100% of AGE REFINING's transportation needs.  In those circumstances

where AGE Transportation may directly bill another client (not AGE REFINING), it is solely

related to the transport and delivery of  AGE REFINING products purchased by its client.

50.    AGE TRANSPORTATION was formed when AGE REFINING purportedly  sold

its transportation capabilities to a women-owned consortium in 2001. The women in charge of AGE TRANSPORATION are concurrently employees of AGE REFINING . The president of AGE TRANSPORATION, Ruth Ann Ernst, a resident of Dallas, is and has been the personal assistant to Mr. Al Gonzalez in AGE REFINING for over 20 years. The Vice President of AGE TRANSPORATION, Lorraine Duffek, is concurrently managing the inbound and outbound aspects of all product transportation, to include raw crude oil and the sale and delivery of other finished products for AGE REFINING. The Chief Financial Officer of AGE TRANSPORATION, Ann Renfroe, concurrently serves as the CFO of AGE REFINING.

51.    It is noteworthy that GONZALEZ had formed the predecessor "AGE Transportation, Inc." ("Old AGE") in 1993, and he served as Officer and Director of said company for its 7+ years in existence. On or about December 27, 2000, GONZALEZ filed Articles of Dissolution for "AGE Transportation, Inc.". On January 4, 2001, seven days later, a new AGE TRANSPORTATION was formed as a Texas corporation and headed by its new President, Ruth Ann Ernst, GONZALEZ's loyal personal assistant. GONZALEZ's name does not appear in any of the corporate documents of the AGE TRANSPORATION entity formed in 2001.

52.    All delivery truck drivers who were non-HUBZONE residents were fired by AGE REFINING and immediately rehired by AGE TRANSPORATION.

53.    With the creation of AGE TRANSPORATION, AGE REFINING was confident it was now able to remove non-HUBZONE employees from its payroll and was better able

to meet and  manage HUBZONE-mandated ratios.  A pared-down AGE REFINING

represented to the SBA that it now had 35% of its employees residing in a HUBZONE.  It

further falsely certified to the SBA on its application and recertifications that the majority of

its employees were working  in the *principal office* at Commerce Street.


54.    Relator has it on information and belief that, for all times relevant to this

lawsuit, AGE REFINING and AGE TRANSPORATION  were operated as one and the

same entity.

55.    As the result of its certified HUBZONE status, AGE REFINING was able to

bid and win several jet fuel contracts with the DLA of the Department of the Defense which

amounted to over $125 Million in revenue to the company in the years 2000-2003.  AGE

REFINING sold jet fuel to Air Force Bases in San Antonio and Del Rio as well as to NASA

and Wright Patterson AFB.   All of these contracts resulted in the United States paying a

10% premium, or an additional estimated $15 Million Dollars,  for the jet fuel as per the

terms of the Price Evaluation Preference (PEP) afforded HUBZONE-qualified companies.


## **ALLEGATIONS OF WRONGDOING**


56.    The purpose of the HUBZONE Program is to serve the interest of the United

States in stimulating economic development   by providing small companies and

businesses preferences in bidding on federal contracts.  GONZALEZ and AGE REFINING

manipulated the application process for HUBZONE status.    By falsely certifying

compliance with the provisions of the HUBZONE Program, DEFENDANTS GONZALEZ

and AGE REFINING were able to obtain HUBZONE certification for AGE REFINING and

all the intendant benefits and preferences that such certification permitted.

57.    In its bid submissions to DLA for jet fuel and other contracts, AGE REFINING

falsely certified that it was an eligible HUBZONE contractor and in compliance with the

qualifications of the HUBZONE program, thereby entitling it to PEP price preferences in

bidding.

58.    GONZALEZ , AGE REFINING, and AGE TRANSPORTATION used a false

record or statement to get a false or fraudulent claim(s) paid or approved by the United

States for which Defendants were not entitled and for which the Government  did not

receive the intended benefits.

59.    During the period of time of his employment at AGE REFINIGN,

Relator notified various members of the senior leadership of his concerns that AGE

REFINING was violating the terms of its DOD contract(s) by employing such practices, but

his opinion was either ignored or rejected . He was instructed to do what was necessary to

maintain the appearance of HUBZONE compliance, and not "rock the boat".

60.    A "Principal Office" is defined as "*the location where the greatest number of

the concern's employees perform their work*".  Relator will show through internal memos,

contracts, applications and other evidence, that AGE REFINING and the other Defendants

knowingly manipulated the employee roster and falsely certified to the United States, that,

for example, the delivery truck drivers were assigned to the Commerce Street office (the

"HUBZONE Location"), when, in fact, the drivers reported and worked , for all purposes,

out of the South Presa Street location.   Defendants conspired to form a new company,

AGE TRANSPORTATION, so as to enhance the ratios of AGE REFINING employees

living in a HUBZONE in an attempt to meet the "*greatest number of employees*" threshold.

It would have been impossible for these drivers to actually report and work out of the

HUBZONE Location as their trucks were located at the plant on South Presa and their

work orders were generated there.   The HUBZONE location listed several

"phantom employees", such as GONZALEZ, Glen Gonzalez, the Vice President, and

Miguel Berain, the dispatcher,  when, in fact, these individuals were rarely, if ever, there.

AGE REFINING leased and set up offices at the HUBZONE location together with name

plaques and desks, when actually only 7 or so employees were actually officed there.

61.    "Reside", per the HUBZONE regulations, applies to an employee and means

"to live in a primary residence at a place for at least 180 days, or as a currently registered

voter, and with the intent to live there indefinitely".   To qualify for HUBZONE status, a

concern must have 35% of its employees residing in the HUBZONE.

62.    AGE REFINING and GONZALEZ rented various apartments in the name of

the company for purposes of attracting existing employees to "move" into the HUBZONE,

going so far as to provide a financial monthly stipend to each employee who agreed to do

so.  Defendants went to great lengths to falsely show that 35% of its employee base lived

in a HUBZONE. AGE REFINING falsely listed various of its senior officers as living in the

HUBZONE when in fact they did not. For example, GONZALEZ , a resident of Dallas and owner of a homestead there appraised at over $550,000, listed his address as 317 Lexington #148 within a San Antonio HUBZONE on the SBA application. GONZALEZ would have the United States believe that he gave up a homestead valued at an estimated $183 a square foot, to make a rental apartment in a San Antonio HUBZONE valued at $31 a square foot his primary residence. Lorraine Duffeck was also included as a HUBZONE resident in the original SBA application, though she had another primary residence. Ruth Ann Ernst was listed as a HUBZONE resident, though she actually resided in Dallas and maintained her real estate license there. Since these members of senior management could not show that they had resided in the HUBZONE for 180 days or more, these individuals registered as voters in the HUBZONE to prove to the SBA that they were "bona fide" residents and had the intent to live there permanently.

63.    GONZALEZ had his wife, Sharron Gonzalez, hired as an "employee" of AGE REFINING, in early 2000, so that AGE REFINING could meet the required 35% threshold. In fact, GONZALEZ's salary was reduced by the amount of compensation allocated to Sharron Gonzalez, and she, too, was listed as a resident of the HUBZONE on the 2000 SBA application. Relator has it on information and belief that Sharron Gonzalez did not perform any services for AGE Refining.

64.    GONZALEZ's son, Glen Gonzalez, was listed as a resident of the HUBZONE and as an employee in the 2003 recertification, when, in fact, he resided out of state in Connecticut and was not a HUBZONE resident. Internal correspondence indicates that he

became a fulltime employee of AGE REFINING and Texas resident in 2004, and served

as a part-time employee in 2003, commuting every other week to San Antonio.

Additionally, until May, 2004, Glen Gonzales held primary residence in Houston.  Three

days a week, he commuted to San Antonio and stayed at an Alamo Heights home owned

by Coleridge Investments, a GONZALEZ affiliate, not in the HUBZONE.

        65.     The creation of AGE TRANSPORTATION was done for the sole purpose of

falsifying compliance with HUBZONE regulations.  Non-HUBZONE employees were hired

by AGE TRANSPORTATION, and if they decided to take advantage of the stipend offered

by AGE REFINING to move into the HUBZONE, they were fired by AGE

TRANSPORTATION and rehired by AGE REFINING.     AGE TRANSPORTATION

employed most of the delivery truck drivers and leased the trucks from AGE REFINING.

AGE TRANSPORATION functioned as a cost center for AGE REFINING, basically

charging its captive client only enough to cover its expenses.   Additionally, AGE

TRANSPORTATION "leased" delivery truck drivers from AGE REFINING.    AGE

REFINING employed those select delivery truck drivers who lived in the HUBZONE.

        66.     AGE TRANSPORATION, was formed in January 2001 as a separate

company, and absorbed over 40 of the AGE REFINING employees who did not live in the

HUBZONE. AGE TRANSPORTATION had its own checking and banking accounts as well

as its own 401(k) plan.  In practice, AGE TRANSPORTATION and AGE REFINING were

one and the same company and operated as such.  For example, the senior management

of both entities overlap, and the two "companies" share benefits programs, to include,

dental, life insurance, and Section 125 Plan.  AGE TRANSPORTATION and AGE

REFINING also share letterhead, email system, website, server, phone system, and the

license to certain proprietary accounting software.  Furthermore, it was not until 2004, that

separate financial statements were prepared for both entities.

67.    Because AGE REFINING was granted HUBZONE certification, it has been

able to bid on lucrative contracts for the provision of jet fuel for various US Air Force Bases

in the region.  AGE REFINING was able to win bids because of its preference, to the

exclusion of honest competitors that actually met the criteria for HUBZONE certification.

68.    Relator would show that Defendants have bid and won several federal

contracts for the provision of jet fuel,  for which it was not eligible.  Notwithstanding the

failure to qualify for preferential treatment under the HUBZone provisions, Defendants

wrongfully and knowingly billed to and received from DOD and the United States

Government reimbursements in the millions of dollars over the last five years  As such,

Relator would show that Defendants submitted false and fraudulent claims to the United

States.

69.    Relator would show that Defendants deliberately claimed HUBZone

status so as to maximize reimbursement and Relator would further show that the

Defendants routinely failed to comply with the requirements of DOD and other federal

guidelines, and as such Defendants submitted false and fraudulent claims to the U.S.

70.    Relator would further show that the false claims and fraudulent acts of

Defendants, as set forth herein, resulted  in the Federal Government's overpayment of

tens of millions of dollars in the years from 1999 to 2004.

71.    During his employment at AGE, Relator observed these and other illegal business practices that violated the law with respect to HUBZONE certification and designation.  These blatant and widespread practices are further explained with exhibits and illustrations in the Disclosure Statement served on the United States with this Complaint.


### FIRST CAUSE OF ACTION

72.    Realtor, in this First Cause of Action, adopts and reiterates all the facts alleged in paragraphs 13 through 71, as fully and completely as if they were incorporated herein verbatim. From 1999 through 2004, Defendants received a major portion of their revenues from the U.S. under the  provisions of various contracts for jet and other fuel with DLA , an agency of DOD.  Relator would show that Defendants, through the acts of their officers, agents, and/or employees knowingly or in deliberate ignorance of the truth or the falsity of the information made, used, or caused to be made or used, a false and fraudulent record or statement to get a false and fraudulent claim paid or approved by the Government to the damage of the Treasury of the United States for services performed including, but not limited to,  the false certification of HUBZONE status entitling it to preferential treatment in federal contract bidding.

## SECOND CAUSE OF ACTION

73.    Relator, in this Second Cause of Action, adopts and reiterates all the facts alleged in paragraphs 13 through 71 as fully and completely as if they were incorporated herein verbatim.  Relator would show that in performing the foregoing acts, Defendants, through the acts of their officers, agents, and/or employees,  knowingly or in deliberate ignorance of the truth or the falsity of the information, conspired to defraud the Government by getting a false and fraudulent claim allowed or paid to the damage of the Treasury of the United States.

## THIRD CAUSE OF ACTION

74.    Relator, in this Third Cause of Action, adopts and reiterates all of the facts alleged in paragraphs 13 through 71 as fully and completely as if they were incorporated herein verbatim.  In addition, Relator charges that in performing the acts hereinbefore set out, Defendants, through the acts of their officers, agents, and/or employees, knowingly or in deliberate ignorance of the truth or the falsity of the information permitted themselves to be unjustly enriched by their false and fraudulent  actions, to the damage of the Treasury of the United States.

## FOURTH CAUSE OF ACTION

75.    Relator, in this Fourth Cause of Action, adopts and reiterates all of the foregoing facts alleged in paragraphs 13 through 56 as fully and completely as if they were incorporated herein verbatim.  In addition, Relator would show that Defendants in their acts and/or practices, knowingly or in deliberate ignorance of the truth or falsity of the

information violated the documentary and procedural requirements for the submission of

claims and for the reimbursement of monies as set forth in Defendants' contracts with the

United States and as such  constitute false and fraudulent claims under the Act.


### PRAYER

55.    Relator demands judgment against the Defendants and each of them as

follows:

      a.    That by reason of the violations of the False Claims Act as

set out in the First to Fourth Causes of Action, this Court

enter judgment against Defendants in an amount equal to

Three (3) times the amount of damages the United States

Government has sustained because of Defendants' actions,

plus a civil penalty of not less than Five Thousand Five

Hundred Dollars ($5,500.00) and not more than Eleven

Thousand Dollars ($11,000.00) for each violation of 31

U.S.C. Section 3729;

      b.    That Relator, as Qui Tam Plaintiff, be awarded the maximum

amount allowed pursuant to section 3730(d) of the False

Claims Act and/or any other applicable provision of law;

      c.    That Relator be awarded all costs of this action, including

Original Complaint                                                    Page 25
US ex rel Carrington v. AGE Refining, Inc., etal

attorneys' fees and Court costs; and

d.     That Relator have such other and further relief as the Court

deems just and proper.

Respectfully Submitted,

By:     _Marlene M. Martin_

MARLENE M. MARTIN
State Bar No. 01393770

## CERTIFICATE OF SERVICE

The undersigned certifies that on this *23* day of December, 2004, a copy of the foregoing original Complaint was placed in the United States Mail, first class mail, postage prepaid, and addressed to:

Honorable John Ashcroft
Attorney General of the United States
555 Fourth Street Northwest
Washington, D.C.  20001

Johnny Sutton,
U.S. Attorney for the Western District
**Glenn Mactaggert, AUSA**
601 N.W. Loop 410, No. 600
San Antonio, Texas  78216


_____
MARLENE M. MARTIN